UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DESMOND WHITE | No. 19 CR 201-14<br><br>Judge Sara L. Ellis |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

Defendant Desmond White distributed fentanyl-laced heroin in Chicago. Despite his repeated arrests, convictions, and sentences for similar crimes, defendant remains undeterred. Indeed, while on release in this case defendant repeatedly violated the terms of his release until the Court revoked his bond. Accordingly, the government respectfully requests that the Court impose a sentence at the low end of the Guidelines range.

**I.     PRESENTENCE INVESTIGATION REPORT**

The government agrees with the criminal history calculations set forth in the Presentence Investigation Report submitted by the United States Probation Office.[1] Defendant has 17 criminal history points and his criminal history category is VI.

The government disagrees with the Probation Officer's offense level calculations, although the government and the Probation Officer arrive at the same Guidelines range of 151 to 188 months' imprisonment.

---

[1] In the Plea Agreement and Government's Version, the government calculated defendant's criminal history points as 15. The government agrees with the Probation Officer that defendant receives two additional criminal history points for a total of 17. His criminal history category remains VI.

The government disagrees with the application of the career offender Guideline.

## II. GUIDELINES CALCULATIONS

### A. Drug Quantity for September 25, 2017

Defendant disputes the drug quantity involved in the transaction in Count 15, in which he distributed narcotics to an undercover law enforcement officer. Defendant agrees that in total, on September 25, 2017, he distributed 32 bags of heroin and fentanyl to the undercover. The government and the Probation Officer have both adopted the findings of the DEA chemist, who determined that the 32 bags defendant distributed contained 10.6 grams of heroin and 5.3 grams of fentanyl.[2]

Defendant, however, points to the CPD and DEA reports that contain a lower estimate (6.8 grams of an unspecific narcotic) of the drug quantity involved. This estimate was made before the DEA laboratory conducted its analysis. Throughout this investigation, as detailed in the Complaint, law enforcement used .2 grams as a low-end estimate of the amount of narcotics in each bag seized from the conspiracy. Applying this estimate of .2 grams per bag to the 32 bags yields 6.4 grams of narcotics – the amount stated as the "ESW" or "estimate street weight" in the CPD report of October 5, 2017, and the "approximate gross quantity" in the DEA evidence log, dated

---

[2] The government has attached the DEA reports to its version of the offense; defendant has attached the CPD report.

October 16, 2017. The DEA chemical analysis report was completed on February 9, 2019, and contains the correct drug quantity.

      **B.    Base Offense Level: Drug Quantity**

The government objects to the Probation Officer's calculation of the drug quantity as limited only to defendant's distribution of narcotics. PSR ¶ 32. Defendant's role in assisting co-defendants Robinson and Frederick Giles with their search for hidden narcotics and firearms before law enforcement could arrive shows an ongoing involvement in the conspiracy. Defendant's participation in the transaction on September 25, 2017, with co-defendant Tyrell Kelly, demonstrates that the workings of the conspiracy were reasonably foreseeable to him.

The government agrees with defendant that he was not a major player in the conspiracy, and the government does not seek to hold defendant accountable for all of its weight, or even a significant portion of its weight. Rather, the government seeks to reach an estimate that reasonably captures defendant's role in the conspiracy as it spanned beyond the one undercover transaction. The drug quantity for one month (PSR 22) is one possible approximation.

      **C.    Career Offender Guideline**

The government objects to the application of the career offender Guideline § 4B1.1. PSR ¶ 38. The record is unclear as to whether defendant's conviction in 13CR0509101 qualifies as a controlled substance offense pursuant to § 4B1.2. To qualify as a controlled substance offense, the conviction must involve the distribution

of a controlled substance, or the possession with intent to distribute a controlled substance. Guideline § 4B1.2(b).

As set out in the document attached to defendant's version of the offense, defendant was convicted in Cook County in case 13CR0509101 after a bench trial. The criminal disposition sheet states that defendant was convicted of count one, which was charged as possession of a controlled substance with intent to deliver, but clearly states he was convicted of a lesser included offense. The rest of the sheet contains handwritten notes that seem to indicate a conviction for possession of a controlled substance ("PCS" is written several times) and also appears to state "C4," suggesting that defendant was convicted of a class four felony – possession of a controlled substance. The remaining documents in the government's possession related to 13CR0509101 shed no additional light on this issue.

For these reasons, the record is at best unclear as to whether defendant was convicted of a second controlled substance offense, and therefore the Court should not apply Guideline § 4B1.1

## III. FOR THIS DEFENDANT, A SENTENCE AT THE LOW END OF THE GUIDELINES RANGE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY

Based on the nature and circumstances of the offense, as well as the history and characteristics of this defendant, this case presents compelling needs to protect the public, as well as for general deterrence. A sentence within the Guidelines range would strike an appropriate balance between all of the competing factors defendant's

4

case presents. Defendant has significant mitigation in his background, but his behavior while on release in this case, his documented history of domestic violence, and his repeated recidivism call for a significant sentence.

### A. Nature and Circumstances of the Offense

As part of the conspiracy, defendant distributed narcotics to law enforcement on September 25, 2017. The government's investigation revealed that repeatedly calling a hotline phone operated by codefendants would yield various dispatchers to distribute narcotics. On September 25, 2017, an undercover called the telephone line operated by Michael Robinson and others, and ordered $300 worth of narcotics. During the telephone call, the operator and the UC agreed to meet at West Van Buren Street and South Paulina Street in Chicago to complete the transaction. Later that day, Tyrell Kelly and White met the UC at the agreed meeting location. The UC approached a white Pontiac in which Kelly was driving and White was a passenger. The UC stated, "This is 300," and handed White $300. In exchange, White distributed three bundles of narcotics to the UC.

As discussed above, the government maintains that defendant participated in the narcotics conspiracy beyond the events of September 25, 2017. The narcotics distributed throughout the conspiracy were reasonably foreseeable to White – his coconspirators distributed the same narcotics, in the same location, repeatedly using the same dispatcher (Robinson) and runners (Kelly and F. Giles) in other transactions. *See United States v. Lomax*, 743 F. App'x 678, 682 (7th Cir. 2018)

5

(reasonable foreseeability "does not require that a coconspirator be aware of the precise quantity involved in each of an ongoing series of illegal transactions'"); *United States v. Miller*, 834 F.3d 737, 742 (7th Cir. 2016) (joint criminal activity may be shown where dealers share customers, swap selling duties, and travel together to sell drugs); *United States v. Melendez*, 819 F.3d 1006 (7th Cir. 2016). In fact, White was arrested in December 2017 for similar activities – distributing the same type of narcotics in the same area.

Further, defendant advanced the larger narcotics conspiracy when he helped Robinson locate other narcotics and firearms that were part of the conspiracy. In late May 2018, codefendant Frederick Giles was arrested and charged with possession of a controlled substance. According to police reports, Giles was in possession of approximately 14 blue bags of heroin and $1,000. Immediately thereafter, defendant and co-defendant Robinson began discussing the arrest on judicially-authorized intercepts. Defendant was heard searching for something, and defendant told Robinson, "I don't think that's the shit we got now." Robinson responded, "It's some blue bags in them . . . it's supposed to be like three bundles." Law enforcement believed that the use of the words to "blue bags" and "shit" by Robinson and defendant was a reference to the blue-tinted bags of heroin the conspirators were distributing at that time (and F. Giles was arrested with blue bags). Robinson instructed defendant to keep looking and to call Robinson when defendant found it. Shortly thereafter, defendant called Robinson and stated that it must be in the safe, and

6

further reported that he had found "7000" and "some guns." Law enforcement believed these statements to be a reference to cash and firearms that defendant had located within the residence.

As part of defendant's narcotics trafficking, he distributed poison to members of his community, without concern for the harm that it caused them. Over the past few years, Chicagoans have seen an enormous increase in opioid abuse. The number of emergency medical encounters involving naloxone or Narcan—a common indicator of an opioid overdose—rose by about 50 percent between 2013 and 2017. Ill. Dep't of Public Health, Div. of Emergency Med. Services, *Opioid Overdose Semiannual Report* 1 (2019), http://www.dph.illinois.gov/ sites/default/files/publications/ 010219oppsopioid-semiannual-report.pdf. At the same time, the total number of deaths in Cook County attributed to an opioid doubled from 486 in 2013 to 970 deaths in 2018. Ill. Dep't of Public Health, Div. of Health Data and Pol'y, *Drug Overdose Deaths by Sex, Age Group, Race/Ethnicity and County* 1 (2018), http://www.dph.illinois.gov/ sites/default/files/Drug%20Overdose%20Deaths%20-%20May%202019.pdf.

The opioid problem is particularly severe in the Chicago area compared to the state, region, and other large cities. In 2017, Chicago's rate of deaths involving opioids (29.1 per 100,000 deaths) was almost double the state's rate (17.2). City of Chicago Dep't of Public Health, Office of Epidemiology and Research, *Annual Opioid*

7

*Surveillance Report – Chicago, 2017* 2 (2018), https://www.chicago.gov/content/ dam/city/ depts/cdph/CDPH/Healthy%20Chicago/ChicagoOpioidReport2018.pdf.

    B.    **Defendant's History and Characteristics**

At age 27, defendant has spent the majority of his adult life in and out of custody. As a child, he was repeatedly arrested; he was charged with possession of a controlled substance beginning at age 12. At age 17, defendant sustained his first adult conviction for possession of a controlled substance, for which he received a sentence of 30 months' imprisonment. It had no effect; while on parole for that offense in 2012, he was arrested and convicted of resisting a peace officer during a suspected narcotics transaction. He was convicted of possessing a controlled substance (the conviction discussed at length above) at age 19 and manufacture/delivery of a controlled substance at age 21. Defendant continued to reoffend while on parole for these crimes, resulting in an additional conviction for possessing a controlled substance at age 24 (during the charged conspiracy in this case).

More troubling even, than the repeated narcotics offenses, is defendant's documented pattern of domestic violence. The PSR includes summaries of arrest reports that involve defendant beating his former girlfriend, culminating in a conviction for battery against her. PSR ¶¶ 59, 85, 88. Similarly, while on bond in this case, defendant exacted a similar pattern of abusive conduct on his current girlfriend. In February 2020, defendant violated his location monitoring to go to his girlfriend's house and kick in her door, despite that fact that she had an order of protection

8

against him. In May 2020, he again went to her home in the middle of the night, violating the terms of his bond and this Court's explicit instructions. When the Court revoked defendant's bond on May 25, 2020, after eight violation reports, defendant failed to turn himself into the USMS and did not respond to calls. He was located only after his girlfriend, yet again, called CPD to report that defendant had threatened her and her child with a firearm. He has been in custody since June 17, 2020.

The circumstances of defendant's childhood were tragic. He suffered physical and emotional abuse from a young age (as reported in the PSR), and the adults in his life completely failed to get him needed treatment for his mental health issues. The PSR documents the severity of defendant's mental health issues and how difficult it is for him to function when he is not medicated. In addition, defendant grew up in violent and crime-ridden neighborhoods. These are all mitigating factors, and defendant's openness to further mental health treatment after this most recent conviction is encouraging.

### C. The Need for Specific Deterrence and to Protect the Public

To date, defendant's longest sentence has been five years' imprisonment, imposed in 2015, which did nothing to deter him from returning to narcotics trafficking. His parole for that offense was revoked three times based on subsequent arrests. PSR ¶ 56. A significant sentence is needed in this case to protect the public and to attempt to stop defendant's cycle of recidivism.

9

## IV. SUPERVISED RELEASE CONDITIONS

The government requests that the Court impose a three-year term of supervised release, which is at the Guidelines range and required by statute. PSR ¶ 133.

### A. Mandatory Conditions

The government respectfully requests that defendant be required to comply with the following mandatory conditions set forth in 18 U.S.C. § 3583(d) and Guideline § 5D1.3(a):

(1) Defendant shall not commit another federal, state, or local offense.

(2) Defendant shall not unlawfully possess a controlled substance.

(5) Defendant shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

(6) Defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release.

The government recommends these conditions to provide adequate deterrence to criminal conduct, and protect the public from further crimes of defendant. In addition, these conditions enhance the ability of the Probation Officer to target interventions with the goal of reducing defendant's risk of re-offending.

### B. Discretionary Conditions

The government requests that defendant be required to comply with the following discretionary conditions permitted by 18 U.S.C. § 3583(d) and Guideline

§ 5D1.3(c) and (d), in order to facilitate supervision by the Probation Officer, support defendant's rehabilitation and reintegration into the community, and promote deterrence and protect the public, and because they are otherwise appropriate in this case:

(1) Defendant shall provide financial support to any dependents if financially able to do so.

(4) Defendant shall seek, and work conscientiously, at lawful employment or pursue conscientiously a course of study or vocational training that will equip the defendant for employment.

(6) Defendant shall refrain from knowingly meeting or communicating with any person whom defendant knows to be engaged, or planning to be engaged, in criminal activity.

(7) Defendant shall refrain from excessive use of alcohol or any use of a narcotic drug or other controlled substance, without a prescription by a licensed medical practitioner.

(8) Defendant shall not possess a firearm, destructive device, or other dangerous weapon.

(9) Defendant shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.

(14) Defendant shall not knowingly leave from the federal judicial district where he is being supervised, unless granted permission to leave by the court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

(15) Defendant shall report to the probation office in the federal judicial district to which he is released within 72 hours of his release from imprisonment. Defendant shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer.
.

(16) Defendant shall permit the probation officer to visit the defendant at any reasonable time at home, work, school, community service location, or other reasonable location specified by a probation officer, and to permit confiscation of any contraband observed in plain view by a probation officer.

(17) Defendant shall notify a probation officer promptly, within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer.

(18) Defendant shall notify a probation officer promptly, within 72 hours, if arrested, charged with a crime, or questioned by a law enforcement officer.

(22) Defendant shall satisfy other such special conditions as ordered.

## C. Special Conditions

In light of the continuing need to protect the public and to ensure that the probation officer can satisfy his or her duty to remain informed about the defendant, as well as to support defendant's rehabilitation and reintegration into the community, the government concurs with the PSR's recommendations that the Court impose the following special conditions of supervision pursuant to 18 U.S.C. § 3563(b)(22) and § 3583(d):

(1) If defendant has not obtained a high school diploma or equivalent, defendant shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

(2) Defendant shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

(3) Defendant shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment,

        perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed. The amount of community service shall not exceed 250 hours.

(5)     Defendant shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

(6)     Defendant you shall provide a probation officer with access to any requested financial information necessary to monitor compliance with conditions of supervised release.

(7)     Within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

(8)     Defendant shall file accurate income tax returns and pay all taxes, interest and penalties as required by law.

(10)     You shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

(11)     Defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court.

(12)     Defendant shall pay to the Clerk of the Court $300 as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to the Chicago Police Department, Sergeant Nancy Gusweiler, 3340 West Fillmore Street, Unite 189, Chicago, Illinois 60624.)

(13)     Defendant shall observe one Reentry Court session, as instructed by his Probation Officer.

## V.     CONCLUSION

For the reasons stated, the government respectfully requests that this Court impose a sentence at the low end of the Guidelines range.

        Respectfully Submitted,

        JOHN R. LAUSCH, JR.
        UNITED STATES ATTORNEY

By:    /s/ *Christine M. O'Neill*
        CHRISTINE M. O'NEILL
        Assistant United States Attorney
        United States Attorney's Office
        219 South Dearborn, 5th Floor
        Chicago, Illinois 60604
        (312) 353-4305
        christine.oneill2@usdoj.gov

Dated: December 30, 2020